**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESEE**
**KNOXVILLE DIVISION**

| | | |
|---|---|---|
| XODUS MEDICAL, INC. | ) | Civil Action |
| | ) | |
| Plaintiff, | ) | No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| EAGLE HEALTH LLC, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Xodus Medical, Inc. ("Xodus" or "Plaintiff"), by and through the undersigned counsel, alleges the following for this Complaint against Defendant Eagle Health LLC.

## THE PARTIES

1.      Xodus is a Pennsylvania corporation having a principal place of business at 702 Prominence Drive, New Kensington, Pennsylvania 15068.

2.      Upon information and belief, Defendant Eagle Health LLC ("Eagle" or "Defendant") is a Tennessee limited liability company having a principal place of business at 419 Erin Dr., Knoxville, Tennessee 37919.

## JURISDICTION AND VENUE

3.      This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 271 et seq., and for trademark infringement arising under the Lanham Act, 15 U.S.C. § 1051 *et seq.*

4. This Court has subject matter jurisdiction under 15 U.S.C. § 1121(a) and 28 U.S.C. §§ 1331 and 1338. Further, this Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

5. This Court has personal jurisdiction over Eagle because Eagle has a principal place of business in this District and has committed, and continues to commit, acts of patent and trademark infringement in this District.

6. Venue is proper under 28 U.S.C. §§ 1391 and 1400 because Defendant resides in this District, is subject to personal jurisdiction in this District, and committed acts of infringement in this District. Because Defendant's acts of infringement and unlawful activity have occurred, and are occurring, in this District, Plaintiff is sustaining harm in this District.

## FACTS

7. Xodus manufactures, markets, and sells The Pink Pad® Trendelenburg Positioning System ("The Pink Pad®"), which is a patented patient safety solution for maintaining patient positioning during Trendelenburg surgical procedures.

8. Xodus is the exclusive licensee of the following patents covering The Pink Pad® and its use: United States Patent No. 8,511,314 ("the '314 Patent"), United States Patent No. 8,464,720 ("the '720 Patent"), and United States Patent No. 9,161,876 ("the '876 Patent") (collectively the "Asserted Patents").

9. On August 20, 2013, the '314 Patent was duly and lawfully issued by the United States Patent and Trademark Office (the "USPTO"). A true and correct copy of the '314 Patent is attached hereto as Exhibit A.

10. On June 18, 2013, the '720 Patent was duly and lawfully issued by the USPTO. A true and correct copy of the '720 Patent is attached hereto as Exhibit B.

11. On October 20, 2015, the '876 Patent was duly and lawfully issued by the USPTO. A true and correct copy of the '876 Patent is attached hereto as Exhibit C.

12. Xodus possesses all substantial rights in and to the Asserted Patents. By written agreement (the "Agreement"), Xodus holds the exclusive right to exploit the Asserted Patents anywhere in the world. The owners of record and transferors have no independent right to sue for infringement of the Asserted Patents. Under the Agreement, Xodus has the sole right, at its option, to bring suit to enforce the Asserted Patents. There are no restrictions on Xodus' right to sue. Xodus has no obligation to secure the consent of any transferor in advance of filing suit to enforce the Asserted Patents against any third party or settling any claim in respect thereof. There is no restriction on Xodus' ability to grant sublicenses or otherwise transfer its substantial rights in the Asserted Patents. The Agreement does not contain a hard termination date. Rather, the term of the Agreement continues in full force and effect until the expiration of the last U.S. patent covered by the Agreement, which includes each of the Asserted Patents. The terms of Xodus' Agreement are thus consistent with an assignment.

13. The Asserted Patents cover, among other things, a Trendelenburg positioning pad and associated systems and methods.

14. The Pink Pad ® is a commercial embodiment of at least one claim of each of the Asserted Patents.

15. Xodus has marked The Pink Pad® with the Asserted Patent numbers since issuance of those patents.

16. The Pink Pad® was introduced into the market by Xodus in February 2012.

17. Since 2012, sales of The Pink Pad® have grown by multiple orders of magnitude.

18.     The Pink Pad® is an innovative and improved solution for patient positioning and is the clinically preferred solution for maintaining patients in Trendelenburg and reverse Trendelenburg positions by many health care providers and networks.

19.     The Pink Pad® and the color pink have come to be representative of the high-quality goods offered by Xodus and the highest standard of care in Trendelenburg positioning.

20.     As result, The Pink Pad® and the color pink as applied to Trendelenburg positioning pads have garnered significant goodwill in the marketplace and among the relevant consuming public.  The relevant consuming public has come to associate the color pink as applied to Trendelenburg positioning pads with Xodus and as being representative of the quality of goods offered by Xodus.

21.     Xodus is also the owner of several trademarks surrounding The Pink Pad®.

22.     In addition to owning trademark registrations for the word mark The Pink Pad®, Xodus is the owner of the entire right, title, and interest in and to United States Trademark Registration No. 5,209,547 ("the '547 Registration"), which states, "The mark consists of the color pink as applied to a pad for an operating table to assist in maintaining patients in a Trendelenburg position."  A copy of the '547 Registration is attached hereto as Exhibit D.

23.     The '547 Registration identifies the following goods and services in International Class 10: "Pad for an operating table to assist in maintaining patients in a Trendelenburg position."

24.     The '547 Registration has achieved incontestable status pursuant to Section 15 of the Lanham Act, 15 U.S.C. § 1065.  Because it has become incontestable, the '547 registration constitutes conclusive evidence of the validity of the registered mark and Xodus' exclusive right to use that mark in commerce. 15 U.S.C. § 1115(b).

25.     Upon information and belief, Eagle manufactures or has manufactured, markets, and sells Trendelenburg positioning pads known as the Talon Pad and two Trendelenburg positioning kits including the Talon Pad known as Eagle 1 and Eagle 2 (collectively, the "Accused Products").

26.     Upon information and belief, the Talon Pad comprises viscoelastic foam.

27.     Upon information and belief, the Talon Pad maintains a depression for a period of time after a depression-generating force is removed.

28.     The below photo shows the Talon Pad and was taken immediately after a hand depressing the Talon Pad was removed:



29.     Upon information and belief, the Talon Pad is designed to be placed on medical procedure tables that can be tilted and, in use, is so placed so as to hold a patient on the table.

30.     Upon information and belief, the Accused Products have no uses outside of use as Trendelenburg positioning pads.

31.     The Accused Products are not staple articles of commerce.

32.     Upon information and belief, the Talon Pad comprises a deformable material with a rate of recovery and holding forces sufficient to hold a patient in Trendelenburg, reverse Trendelenburg, or other tilted medical procedure positions.

33.     The Talon Pad is pink or confusingly similar to pink in color, as demonstrated below next to its associated purple arm protectors:



34.     The use of the color pink or a substantially similar color in the Talon Pad is an attempt to trade off the goodwill and reputation surrounding The Pink Pad® and Xodus' trademark rights in the color pink as applied to Trendelenburg positioning systems.

35. There is no reason why the Talon Pad needs to be pink or a color substantially similar to pink over any other color other than to trade on the goodwill and reputation of The Pink Pad® and Xodus' trademark rights in the color pink for Trendelenburg positioner pads.

36. Eagle and Xodus market and sell their respective Trendelenburg positioning products in the same channels of trade, namely directly to medical professionals and hospitals, through third-party medical equipment distributors, and through sales representatives.

37. Eagle and Xodus both advertise their respective Trendelenburg pad positioning systems online.

38. Upon information and belief, Chris Doody is a member, principal, and the registered agent of Defendant Eagle.

39. Mr. Doody is also an independent sales consultant for Adler Instrument Company ("Adler").

40. Adler sells and distributes medical devices.

41. Upon information and belief, Mr. Doody is an independent contractor of Adler.

42. Prior to 2025, Adler represented Xodus as a sales partner and marketed and sold The Pink Pad®.

43. Adler was bound by confidentiality, non-disclosure and non-compete obligations that were memorialized in an agreement with Xodus (the "Adler Agreement").

44. The Adler Agreement precluded Adler, its employees, agents, and principals from disclosing publicly or to any third party Xodus' customer lists and identities, potential customer lists and identities, pricing information, product specifications and processes, and sales terms, among other things (the "Xodus Confidential Information") and from using the Xodus Confidential Information for Adler's or any third-party's benefit.

45.     Eagle, vis-à-vis Mr. Doody's relationship with Adler, was and continues to be aware of Adler's confidentiality obligations to Xodus.

46.     In 2024, after nearly 10 years of representing Xodus, Adler terminated its relationship with Xodus and stopped selling The Pink Pad®.

47.     During its relationship with Xodus, Adler and Xodus conducted numerous meetings concerning The Pink Pad® at which Mr. Doody was present.

48.     Eagle, vis-à-vis Mr. Doody's position with Adler, was aware of pending litigation concerning The PinkPad® and infringement of the Asserted Patents by at least two infringers, namely, U.S. Surgitech Inc. and Prime Medical, LLC.

49.     Mr. Doody, through his position with Adler, marketed and sold The Pink Pad® prior to the termination of Adler's relationship with Xodus.

50.     Eagle, vis-à-vis Mr. Doody's position with Adler, had and continues to have access to Xodus' customer and pricing lists.

51.     Eagle, vis-à-vis Mr. Doody's position with Adler, had actual knowledge of the Asserted Patents prior to the formation of Defendant Eagle.

52.     Eagle, vis-à-vis Mr. Doody's position with Adler, had actual knowledge of Xodus' trademark rights in The Pink Pad® and the '547 Registration prior to the formation of Defendant Eagle.

53.     For at least the reasons identified in the preceding fifteen paragraphs, Eagle also had actual knowledge of the Asserted Patents, Xodus' trademark rights in The Pink Pad® and the '547 Registration, and Adler's confidentiality obligations to Xodus prior to commencing the manufacture, marketing, and sale of the Talon Pad.

54.     Upon information and belief, Eagle has used the Xodus Confidential Information in developing, making, marketing, selling, and offering to sell the Accused Products.

55.     Accordingly, Eagle's conduct and infringement, as detailed herein, was intentional and willful.

<u>**Count I**</u>
**(Infringement of the '314 Patent)**

56.     Plaintiff incorporates by reference herein the averments set forth in all preceding paragraphs of this Complaint as if set forth herein in their entirety.

57.     Eagle's manufacture, sale, and/or offer for sale of the Accused Products infringes, literally or through the doctrine of equivalents, at least claims 1-4, 9-10, 12-14, 17-20, 23-24, and 26 of the '314 patent (the "Asserted '314 Claims").

58.      The Accused Products directly infringe at least claims 1-4, 9-10, 12-14, and 17-20 of the '314 Patent.

59.     Eagle's manufacture, use, sale, and/or offer for sale of the Accused Products constitute contributory and/or induced infringement of at least claims 23-24 and 26 of the '314 Patent.

60.     Upon information and belief, Eagle had actual knowledge that the Accused Products infringe one or more of the claims the '314 Patent.

61.     The Accused Products are marked, sold, and offered for sale for the purpose of holding a patient on a medical or operating room procedure table in a Trendelenburg, reverse Trendelenburg, or other tilted medical procedure positions.

62.     The Accused Products are patient support arrangements that comprise a pad configured to be placed on a tiltable medical procedure table, with the pad having a length

sufficient to extend from about at least the thighs of a patient to about at least the shoulders of a patient to support a torso of a patient placed on the pad.  (*See* '314 patent claim 1).

63.     The Talon Pad comprises a deformable material, the deformable material being configured to be deformable by the torso of a patient to form a depression in a pad, the depression providing a substantial portion of the holding forces which hold a patient generally in a desired position on the pad upon the medical procedure table being tilted at an angle and thus the torso of a patient being tilted at an angle with respect to the horizontal such that: a) the head of the patient is disposed lower than the torso; or b) the head of the patient is disposed higher than the torso; or c) the right side of the patient is disposed higher than the left side; or d) the left side of the patient is disposed higher than the right side; or e) a combination of a), b), c), and d).  (*See* '314 patent claim 1).  Upon information and belief, the Talon Pad is made from a viscoelastic foam, thus indicating that the torso of a patient placed on the foam pad will deform the pad and create a depression that will provide a substantial portion of the holding force required to keep the patient in a desired position.

64.     The Talon Pad comprises a deformable material with a rate of recovery sufficiently slow to maintain a depression in a pad for a desired period of time upon a change in a depression-generating force on the pad, and the pad is configured to distribute pressure forces across a substantial portion of the torso of a patient in contact with the pad to minimize injuries generated by concentration of pressure forces on at least one portion of the torso of the patient in contact with the pad during a medical procedure.  The Talon Pad has a rate of recovery sufficiently slow to maintain a depression in the pad for a desired period of time upon a change in a depression-generating force on the pad.  Upon information and belief, the Talon Pad distributes pressure forces across a portion of the patient's torso in order to comfort the patient and prevent unwanted contact

during procedures so as to at least minimize the risk of brachial plexus injuries that may occur in a portion of the patient's shoulder contacting the pad.

65. Upon information and belief, the Talon Pad is sufficiently thick to permit formation of a depression having a depth sufficient to assist in holding a patient generally in a desired position on the pad upon a medical procedure table being tilted at an angle and thus the torso of a patient being tilted at an angle with respect to the horizontal.

66. Upon information and belief, the Talon Pad comprises a deformable material that has a coefficient of static friction sufficient to assist in holding a patient generally in a desired position on the pad upon a medical procedure table being tilted at an angle.

67. Upon information and belief, the Talon Pad is sufficiently thin to stabilize a patient on the pad upon the medical procedure table being tilted at an angle.

68. Upon information and belief, the Accused Products include or are a patient and support arrangement wherein a deformable material has a coefficient of static friction sufficient to assist in holding a patient generally in a desired position on a pad upon a medical procedure table being tilted at an angle.

69. Upon information and belief, the Talon Pad is sufficiently thick to permit formation of a depression having portions of different depths, such that the depths of the portions of the depression formed by the buttocks and scapular region of the torso of a patient are greater than the depths of other portions of the depression, and such that the deeper portions of the depression provide a greater portion of the holding forces than shallower portions of the depression.

70. Upon information and belief, the Talon Pad comprises a retaining arrangement configured to at least assist in the retention of a pad on a medical procedure table and the pad has a thickness in the range of from approximately three-fourths of an inch to three inches or greater.

71.     Upon information and belief, the Talon Pad comprises a deformable material that comprises a rebound, such as ball rebound, being sufficiently small to minimize undesirable movement of a patient during a medical procedure, an indentation force deflection sufficient to permit formation of a depression having a depth sufficient to at least assist in holding a patient on a medical procedure table, an air flow sufficient to provide substantial air flow about a patient, and a tensile strength sufficient to minimize tearing of the deformable material.

72.     Upon information and belief, the Talon Pad comprises at least one of a)-g): a) a ball rebound in the range of approximately 0.1 percent to approximately 5 percent; b) an air flow in the range of approximately 0.1 to approximately 3.0 cubic feet per minute; c) an indentation force deflection in the range of approximately 7 to approximately 18 pounds; d) a tensile strength in the range of approximately 5 pounds per square inch to approximately 15 pounds per square inch; e) a deformable material that comprises a coefficient of static friction of at least approximately 0.2; f) the deformable material comprises a compression set, for a 25 percent compression, which is less than approximately one percent; and g) the deformable material comprises a density in the range of approximately 75 kilograms per cubic meter to approximately 110 kilograms per cubic meter.

73.     Upon information and belief, the Talon Pad comprises at least one of h)-n):  h) a ball rebound in the range of approximately 0.1 percent to approximately 1.9 percent; i) an air flow is in the range of approximately 0.3 to approximately 1.0 cubic foot per minute; j) an indentation force deflection in the range of approximately 10 to approximately 15 pounds; k) a tensile strength in the range of approximately 8 pounds per square inch to approximately 12 pounds per square inch; l) a deformable material comprising a coefficient of static friction in the range of approximately 0.2 to approximately 1.0; m) the deformable material comprises a compression set

for a 25 percent compression, which is less than approximately 0.3 percent; and n) the deformable material comprises a density in the range of approximately 83 kilograms per cubic meter to approximately 103 kilograms per cubic meter.

74.     Upon information and belief, the Talon Pad is sufficiently thick to permit formation of a depression having a depth sufficient to assist in holding a patient on the pad, and comprises a deformable material having a coefficient of static friction sufficient to assist in holding a patient on the pad, which coefficient of static friction and depression depth are sufficient to together provide at least a substantial portion of the holding forces which hold a patient generally in a desired position on the pad upon a medical procedure table being tilted at an angle.

75.     Eagle will continue to infringe the '314 Patent unless enjoined by this Court.

76.     Upon information and belief, Eagle had actual knowledge that the Accused Products infringe one or more of the claims the '314 Patent.

77.     Thus, Eagle committed its acts of infringement without license or authorization and has done so with knowledge of the '314 Patent and egregious disregard for Plaintiffs' rights in the '314 Patent.

78.     Eagle's conduct in infringing the '314 Patent is intentional and wanton, constituting willful infringement entitling Plaintiffs to treble damages and attorneys' fees incurred in prosecuting this action 35 U.S.C. §§ 284 and 285.

79.     Plaintiff has been irreparably damaged and will continue to be irreparably damaged by reason of Eagle's infringement of the '314 Patent unless restrained from committing its infringing acts by this Court, and Plaintiff is without adequate remedy at law.

## Count II
### (Infringement of the '720 Patent)

80.     Plaintiff incorporates by reference herein the averments set forth in all preceding paragraphs of this Complaint as if set forth herein in their entirety.

81.     Eagle's manufacture, sale, and/or offer for sale of the infringe, literally or through the doctrine of equivalents, at least claims 1, 2, 4, 6-8, and 10-12 of the '720 Patent (the "Asserted '720 Claims").

82.     The Accused Products directly infringe at least claims 4, 8, and 11-12 of the '720 Patent.

83.     Eagle's manufacture, use, sale, and/or offer for sale of the Accused Products constitute contributory and/or induced infringement of at least claims 1, 2, 6-7, and 10 of the '720 Patent.

84.     Upon information and belief, Eagle had actual knowledge that the Accused Products infringe one or more of the claims the '720 Patent.

85.     The Accused Products are marketed, sold, and offered for sale for the purpose of holding a patient on a medical or operating room procedure table in a Trendelenburg, reverse Trendelenburg or other tilted medical procedure.

86.     Upon information and belief, the Accused Products minimize injuries caused by pressure on portions of a body of a patient in a Trendelenburg position on a surgical operating table, minimize unwanted movement of a patient in the Trendelenburg position on a surgical operating table by securing a patient to the surgical operating table, and also minimize contamination in an operating room, by including and using a single-use Trendelenburg patient support system comprising:  a lift sheet configured to lift and position a patient on a surgical operating table, body straps configured to hold a patient down on a surgical operating table, the

Talon Pad being a single-use viscoelastic Trendelenburg pad comprising a rectangular shape and viscoelastic polyurethane, and securing straps welded to the Talon Pad to secure the Talon Pad to rails of a surgical operating table.

87.     In use, the Talon Pad is placed by Eagle or hospital personnel on a medical procedure table, wherein a longitudinal edge of the Talon Pad is placed adjacent to and in alignment with a longitudinal edge of a surgical operating table having table rails.

88.     Further, in use, a latitudinal edge of the Talon Pad is placed adjacent to and in alignment with a latitudinal edge of a surgical operating table, such that the Talon Pad is positioned on the surgical operating table where the body of a patient will be lying.

89.     Further, in use, the securing straps, which extend from longitudinal edges of the Talon Pad, are positioned down and away from the pad and then attached to the surgical operating table rails.

90.     In use, a patient is placed on the Talon Pad in a supine position on the lift sheet so that the shoulders of the patient do not extend past edges of the Talon Pad, wherein the patient's body deforms the Talon Pad.

91.     Upon information and belief, the Talon Pad has sufficient thickness and viscosity to sufficiently cushion the body of the patient to at least one of: minimizing bottoming out and prevent bottoming out on the medical procedure table of one or more of the portions of the body of the patient during positioning of the patient and during the surgical procedure, and to minimize injuries from pressure during a surgical procedure performed while a patient is in lithotomy and Trendelenburg positions.

92.     Upon information and belief, the Talon Pad is of sufficient thickness to at least minimize the risk of brachial plexus injuries that may occur in a portion of the patient's shoulder experiencing pressure by contacting the pad.

93.     Upon information and belief, the Talon Pad is sufficiently compliant to conform to a substantial portion of the body.

94.     During a surgical procedure, the lift sheet may be lifted by medical personnel to lift the patient up and off the Talon Pad to reposition the patient as or if needed.

95.     In use, the arms of a patient are positioned by medical personnel as or if needed, and body straps are attached around the patient and to the surgical operating table.

96.     Upon information and belief, when the Talon Pad is used in a lithotomy medical procedure, the legs of a patient are placed in a lithotomy position.

97.     When a the Talon Pad is placed on a medical procedure table or surgical operating table, the angle of inclination of the table is adjusted to orient the patient at an angle in the Trendelenburg, reverse Trendelenburg, or other tilted position wherein the head of the patient is disposed above the body of the patient, or in which the right side of the patient is disposed above the left side or vice versa, or a combination of any of these positions.

98.     Upon information and belief, the Talon Pad sufficiently thin to stabilize the patient on a surgical operating table upon the patient being in Trendelenburg, reverse Trendelenburg, lithotomy and Trendelenburg, or other tilted medical procedure positions.

99.     Upon information and belief, the Talon Pad is sufficiently thick and compliant to permit formation of a cavity in the pad of a depth sufficient to at least one of:  assist in holding said patient on said surgical operating table, and assist in minimizing undesired movement of the

body of said patient on said surgical operating table, during a surgical procedure performed while said patient is in said lithotomy and Trendelenburg positions.

100.   Upon information and belief, the Talon Pad includes securing straps that are attached to a lower side of the pad, and each strap includes a hook and loop fastener.

101.   The Talon Pad is three-fourths of an inch or greater in thickness.

102.   Upon information and belief, the Talon Pad has a ball rebound sufficiently small to minimize rebound of a patient during an operation, a compression set sufficiently small to minimize discomfort of and injury to the patient on the surgical operating table, an air flow sufficient to provide substantial air flow about the patient to minimize injury to the patient and maintain a patient in the Trendelenburg or other desired tilted position, an indentation force deflection sufficient to provide a securing hold on the patient, a tensile strength sufficient to minimize tearing of the pad, a coefficient of static friction sufficient to assist in minimizing movement of the pad on the surgical operating table when the patient is on the surgical operating table, and a density configured to provide the ball rebound, the compression set, the air flow, the indentation force deflection, the tensile strength, and the coefficient of static friction.

103.   Eagle will continue to infringe the '720 Patent unless enjoined by this Court.

104.   Upon information and belief, Eagle had actual knowledge that the Accused Products infringe one or more of the claims the '720 Patent.

105.   Thus, Eagle committed its acts of infringement without license or authorization and has done so with knowledge of the '702 Patent and egregious disregard for Plaintiffs' rights in the '702 Patent.

106.     Eagle's conduct in infringing the '702 Patent is intentional and wanton, constituting willful infringement entitling Plaintiffs to treble damages and attorneys' fees incurred in prosecuting this action 35 U.S.C. §§ 284 and 285.

107.     Plaintiff has been irreparably damages and will continue to be irreparably damages by reason of Eagle's infringement of the '720 Patent unless restrained from committing its infringing acts by this Court, and Plaintiff is without adequate remedy at law.

### Count III
### (Infringement of the '876 Patent)

108.     Plaintiff incorporates by reference herein the averments set forth in all preceding paragraphs of this Complaint as if set forth herein in their entirety.

109.     Eagle's manufacture, sale, and/or offer for sale of the infringe, literally or through the doctrine of equivalents, at least claims 1-4, 6-8, 11-14, and 17-20 of the '876 Patent (the "Asserted '876 Claims").

110.     The Accused Products directly infringe at least claims 1-4, 6-8, and 11-14 of the '876 Patent.

111.     Eagle's manufacture, use, sale, and/or offer for sale of the Accused Products constitute contributory and/or induced infringement of at least claims 17-20 of the '876 Patent.

112.     Upon information and belief, Eagle had actual knowledge that the Accused Products infringe one or more of the claims the '876 Patent.

113.     The Accused Products are patient support arrangements configured to support a body of a patient comprising thighs, shoulders, a torso, and a head, which patient has a right side and a left side, the patient support arrangement comprising a pad arrangement configured to be placed on a tiltable medical procedure table, the pad arrangement having a length sufficient to

extend from about at least the thighs of the patient to about at least the shoulders of the patient to support the torso of the patient placed on the pad arrangement.

114.    Eagle will continue to infringe the '876 Patent unless enjoined by this Court.

115.    Thus, Eagle committed its acts of infringement without license or authorization and has done so with knowledge of the '876 Patent and egregious disregard for Plaintiffs' rights in the '876 Patent.

116.    Eagle's conduct in infringing the '876 Patent is intentional and wanton, constituting willful infringement entitling Plaintiffs to treble damages and attorneys' fees incurred in prosecuting this action 35 U.S.C. §§ 284 and 285.

117.    Plaintiff has been irreparably damages and will continue to be irreparably damages by reason of Eagle's infringement of the '876 Patent unless restrained from committing its infringing acts by this Court, and Plaintiff is without adequate remedy at law.

**Count IV**
**(Trademark Infringement of the '547 Registration under 15 U.S.C. § 1114)**

118.    Plaintiff incorporates by reference herein the averments set forth in all preceding paragraphs of this Complaint as if set forth herein in their entirety.

119.    Xodus is the owner of the '547 Registration for "the color pink as applied to a pad for an operating table to assist in maintaining patients in a Trendelenburg position" in connection with the following goods: "Pad for an operating table to assist in maintaining patients in a Trendelenburg position." *See* Exhibit E.

120.    Xodus has been using the color pink on the identified goods in interstate commerce at least since February 2012. Xodus has thus developed extensive goodwill and recognition as the source of pink pads for use on operating tables to assist in maintaining patients in the Trendelenburg and similar positions.

121. The Talon Pad is a pink Trendelenburg positioning pad.

122. Eagle sells the Talon Pad without permission or license from Xodus.

123. Eagle's use of the color pink and/or a color confusingly similar to pink in this manner is likely to cause confusion, or to cause mistake, or to deceive consumers of Eagle's products that Eagle and/or its products are created, sponsored, endorsed, authorized, or licensed by, or otherwise associated with, Xodus and/or The Pink Pad®.

124. Eagle's conduct in this regard is knowing, willful, and deliberate, and designed specifically to trade upon the considerable goodwill associated with Xodus' federally registered "pink color" mark.

125. The above-described acts of Eagle constitute trademark infringement the '547 Registration in violation of 15 U.S.C. § 1114, entitling Xodus to relief.

126. Xodus has been, and is likely to continue to be, irreparably harmed and damaged by Eagle's willful acts of trademark infringement if Eagle is not restrained, in that Xodus has suffered and is likely to suffer a loss of sales and profits and a destruction of goodwill each time customers believe that Eagle's products are created, sponsored, endorsed, authorized, or licensed by, or otherwise associated with, Xodus and/or The Pink Pad®.

127. Eagle's conduct has also irreparably harmed, and if not enjoined, will continue to irreparably harm the consuming public, which has an interest in being free from confusion, mistake, and deception.

128. By reason of Eagle's acts alleged herein, Xodus' remedy at law is not adequate to compensate Xodus for the injuries inflicted by Eagle. Accordingly, Xodus is entitled to preliminary and permanent injunctive relief against Eagle pursuant to 15 U.S.C. § 1116.

129.   By reason of Eagle's willful acts, Xodus is entitled to damages, and those damages should be trebled, under 15 U.S.C. § 1117.

130.   This is an exceptional case, making Xodus eligible for an award of attorneys' fees under 15 U.S.C. §1117.

<u>**Count V**</u>
**(False Designation of Origin/Trademark Infringement under 15 U.S.C. § 1125(A))**

131.   Plaintiff incorporates by reference herein the averments set forth in all preceding paragraphs of this Complaint as if set forth herein in their entirety.

132.   Xodus is the exclusive owner of the color pink as applied to a pad for an operating table to assist in maintaining patients in a Trendelenburg position.

133.   The Talon Pad is a pink Trendelenburg positioning pad.

134.   Eagle sells the Talon Pad without permission or license from Xodus.

135.   Eagle's use of the color pink and/or a color confusingly similar to pink in this manner is likely to cause confusion, or to cause mistake, or to deceive consumers of Eagle's products that Eagle and/or its products are created, sponsored, endorsed, authorized, licensed by, or otherwise associated with Xodus and/or The Pink Pad®.

136.   Eagle's conduct in this regard is knowing, willful, and deliberate, and is designed specifically to trade upon the considerable goodwill associated with Xodus' federally registered "pink color" mark.

137.   Eagle's use of the infringing color in this regard constitutes a false designation of origin, which is likely to deceive consumers into believing that Eagle's goods and services are those of Xodus or are sponsored, endorsed, authorized, or licensed by, or otherwise associated with, Xodus and/or The Pink Pad®.  As a consequence, Eagle's conduct is likely to divert customers away from Xodus.

138.     The above-described acts of Eagle constitute trademark infringement of Xodus' pink color mark and false designation of origin in violation of 15 U.S.C. § 1125(a), entitling Xodus to relief.

139.     Eagle has unfairly profited from the actions alleged in an amount to be determined at trial.

140.     By reason of Eagle's acts alleged herein, Xodus has suffered damage to the goodwill associated with its pink color mark.

141.     Eagle's activities have irreparably harmed and, if not enjoined, will continue to irreparably harm Xodus and Xodus' pink color mark.

142.     Eagle's activities have irreparably harmed and, if not enjoined, will continue to irreparably harm the relevant consuming public, which has an interest in being free from confusion, mistake and deception.

143.     Eagle's actions will cause Xodus to lose the benefit of the substantial investment made in developing, marketing, and selling its goods.  Eagle's improper actions are intended to cause harm to Xodus.

144.     By reason of Eagle's acts alleged herein, Xodus' remedy at law is not adequate to compensate Xodus for the injuries inflicted by Eagle.  Accordingly, Xodus is entitled to preliminary and permanent injunctive relief against Eagle pursuant to 15 U.S.C. § 1116.

145.     By reason of Eagle's willful acts, Xodus is entitled to damages, and those damages should be trebled, under 15 U.S.C. § 1117.

146.     This is an exceptional case, making Xodus eligible for an award of attorneys' fees under 15 U.S.C. §1117.

147.    Eagle's false designation of origin and trademark infringement will continue unless enjoined by this Court.

## Count VI
### (Common Law Unfair Competition by Eagle)

148.    Plaintiff incorporates by reference herein the averments set forth in all preceding paragraphs of this Complaint as if set forth herein in their entirety.

149.    Eagle's trademark infringement as herein alleged constitutes unfair competition by Eagle, who is interfering with and depriving Xodus of its rights in and to Xodus' pink color mark, and falsely associating Eagle's products with Xodus, Xodus' pink color mark, and The Pink Pad®, resulting in immediate and irreparable damage to Xodus and its ability to commercially profit from its trademarks and associated goodwill.

150.    As the direct and proximate result of Eagle's infringement and unfair competition as herein alleged, Xodus has been and will continue to be irreparably, materially, and substantially harmed and damaged.

## PRAYER FOR RELIEF

**WHEREFORE**, Xodus prays that this Court enter Judgment against Eagle as follows:

a.    that Eagle, its officers, employees, agents, and those persons in active participation with them be preliminarily and permanently enjoined from infringing the claims of United States Patent Nos. 8,511,314, 8,464,720, and 9,161,876;

b.    that Eagle infringed and continues to infringe the claims of United States Patent Nos. 8,511,314, 8,464,720, and 9,161,876, and that such infringement was willful;

c.    that Eagle be ordered to pay damages to Plaintiffs pursuant to 35 U.S.C. § 284, comprising interest from the dates of infringement, resulting from Eagle's infringement of the claims of United States Patent Nos. 8,511,314, 8,464,720, and 9,161,876;

d.      that Eagle be ordered to pay to Plaintiffs treble damages pursuant to 35 U.S.C. § 284, resulting from Eagle's willful infringement of United States Patent Nos. 8,511,314, 8,464,720, and 9,161,876;

e.      that Plaintiffs be awarded their costs of this action and reasonable attorneys' fees pursuant to 35 U.S.C. § 284 and 285;

f.      that Eagle, its officers, employees, agents, and those persons in active participation with them be preliminarily and permanently enjoined from infringing Xodus' United States Trademark Registration No. 5,209,547 and Xodus' pink color mark under the Lanham Act and common law;

g.      that Eagle infringed and continues to infringe Xodus' United States Trademark Registration No. 5,209,547, and Xodus' pink color mark under the Lanham Act and common law and that Eagle committed such infringement willfully;

h.      that Eagle be ordered to pay damages to Xodus for any and all profits derived by reason of the trademark infringement acts complained of in this Complaint and/or statutory damages pursuant to 17 U.S.C. § 504 and 15 U.S.C. §§ 1114, 1117 and 1125;

i.      that Eagle be ordered to pay to Xodus monetary damages incurred by Xodus in an amount to be determined at trial;

j.      that Eagle be ordered to pay to Xodus treble damages pursuant to 15 U.S.C. § 1117(b), resulting from Eagle's willful infringement of Xodus' trademark rights;

k.      that Eagle be ordered to pay costs and reasonable attorneys' fees as provided by 15 U.S.C. § 1117, and/or common law;

l.      that Eagle be ordered to pay Xodus punitive damages;

m.     that Eagle to pay Plaintiffs pre-judgment and post-judgment interest on any damages or profits awarded; and

n.     that Plaintiffs be awarded such further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury for all issues triable by a jury.

Respectfully submitted,

Dated: June 19, 2025          *s/John T. Winemiller*

**THE WEBB LAW FIRM**
Kent E. Baldauf, Jr. (*PHV to be filed*)
Thomas C. Wolski (*PHV to be filed*)
Anthony W. Brooks (*PHV to be filed*)
One Gateway Center
420 Ft. Duquesne Blvd., Suite 1200
Pittsburgh, PA 15222
412.471.8815
412.471.4094 (fax)
kbaldaufjr@webblaw.com
twolski@webblaw.com
abrooks@webblaw.com

*AND*

**MERCHANT & GOULD P.C.**
John T. Winemiller (TN No. 021084)
Ian G. McFarland (TN No. 030549)
800 S. Gay Street, Suite 2150
Knoxville, TN 37929
865.380.5960
612.332.9081 (fax)
jwinemiller@merchantgould.com
imcfarland@merchantgould.com

*Attorneys for Plaintiffs*